UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                                    REPORT & RECOMMENDATION
_____
                            Plaintiff,
                                                                    04-CR-6130L

              v.

ZECHARIAH BURNETT,

                            Defendant.

_____


## PRELIMINARY STATEMENT

              By Order of Hon. David G. Larimer, United States District Judge, dated August

24, 2004, all pretrial matters in the above-captioned case have been referred to this Court

pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 7).

              Defendant Zechariah Burnett (hereinafter "Burnett") is charged in a three-count

indictment.  The first count charges Burnett with possession and use of firearms in furtherance of

a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  The second count charges

Burnett with possession with intent to distribute five grams or more of cocaine base, in violation

of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  The final count charges Burnett with possession of

five grams or more of cocaine base, in violation of 21 U.S.C. § 844(a).  (Docket # 5).

              Currently pending before this Court for a report and recommendation are

Burnett's motions to suppress two identifications of him made during a show-up procedure and

to suppress tangible evidence.[1]  (Docket # 21).  Evidentiary hearings were held before this Court

on December 6, and December 30, 2004, and January 7, January 28, and March 3, 2005.  (Docket

## 29, 33, 34, 36, 42).  The following constitutes the report and recommendation of this Court.


## FACTUAL BACKGROUND

This Court conducted a *Wade* hearing on Burnett's motion to suppress

identifications, during which testimony was offered by Officer Ed Bernabei and Investigator

Douglas Boccardo of the Rochester Police Department.  A hearing was also conducted on

Burnett's motion to suppress tangible evidence.  Special Agent Sean Martineck of the Bureau of

Alcohol, Tobacco and Firearms, and Rochester Police Officers John Kolyer and John Brennan

testified on behalf of the government.  The defense called Rochester Police Investigators David

Giudici and John Fiorica.  Zechariah Burnett also testified on his own behalf.


**Testimony of Officer Ed Bernabei:**  At approximately 1:00 p.m. on August 4,

2004, Officer Ed Bernabei was working in an undercover capacity when he heard gunshots fired

near the corner of Third Street and Central Park.  (Tr.A 8, 12; Tr.B 4).[2]  At the time, Bernabei

---

[1]  Burnett's omnibus motion also sought, *inter alia*, discovery and inspection, *Brady* material, a bill of particulars and the removal of surplusage from the Indictment.  (Docket # 21).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on November 16, 2004.  (Docket # 27).


[2]  An excerpt of the transcript of the detention hearing conducted before this Court on September 9, 2004, shall hereinafter be referenced as "Tr.A __."  (Docket # 14).  By stipulation of the parties, this transcript was incorporated into the record of the September 9, 2004 hearing as Government's Exhibit 1.
     The transcript of the suppression hearing conducted before this Court on December 6, 2004, shall hereinafter be referenced as "Tr.B __."  (Docket # 29).
     The transcript of the suppression hearing conducted before this Court on December 30, 2004, shall hereinafter be referenced as "Tr.C __."  (Docket # 34).
     The transcript of the suppression hearing conducted before this Court on January 7, 2005, shall

was in an unmarked police car parked approximately one hundred yards from that intersection. (Tr.A 9). When the shots were fired, Bernabei observed four or five individuals running from the corner. (Tr.A 10-11; Tr.B 26-27). Bernabei recalled that one of the individuals was wearing a blue hooded sweatshirt, another was wearing a camouflage outfit and a third was wearing a white shirt. (Tr.A 11, 14). Following his observations, Bernabei broadcast over the police radio that shots had been fired near his location and described the individuals running from the scene. (Tr.A 12).

Bernabei then moved closer to the scene, and he observed some of the individuals running through the yards of the houses on the street. (Tr.A 16). The individual wearing the white tee-shirt, whom he later identified as Zechariah Burnett, ran to a nearby van, got into the vehicle and drove to a driveway located approximately forty or fifty feet from Bernabei's location. (Tr.A 17-18; Tr.B 10-12). Bernabei observed Burnett as he got out of the van and ran to an Oldsmobile that was parked in the backyard of a house later identified as 34 Third Street. Burnett appeared to use a key to open the front passenger's side door of the Oldsmobile. After opening the door, Burnett reached down, then stood up, closed the door and ran back to the van. (Tr.A 19). Bernabei estimated that two to three minutes elapsed from the time Burnett exited the van until he reentered it. (Tr.B 4, 14-15).

The van drove on Third Street towards the intersection with Pennsylvania Avenue and parked. Shortly thereafter, a black Mazda that had been parked nearby pulled up to the van,

hereinafter be referenced as "Tr.D __." (Docket # 33).

The transcript of the suppression hearing conducted before this Court on January 28, 2005, shall hereinafter be referenced as "Tr.E __." (Docket # 36).

The transcript of the suppression hearing conducted before this Court on March 3, 2005, shall hereinafter be referenced as "Tr.F __." (Docket # 42).

and Burnett exited the van and entered the Mazda.  (Tr.A 19-20; Tr.B 19-21).  At this point,

Bernabei used his police radio to request a traffic stop of the black Mazda, and from his location

approximately one hundred yards away, he observed the traffic stop being made.  (Tr.A 20-21).

While the traffic stop was occurring, Bernabei approached the Oldsmobile and checked to see

whether the doors were locked, which they were.  (Tr.A 22, 27).

Over one hour later, Bernabei observed Burnett for a second time, approximately

one block away, at the intersection of Pennsylvania Avenue and Fourth Street.  (Tr.B 4).

Bernabei had been directed to return to the intersection for the purpose of participating in an

identification procedure relating to the earlier events.  (Tr.B 5).  Following that direction, he

drove an unmarked vehicle onto Pennsylvania Avenue near the intersection with Third Street,

parked and exited the vehicle.  (Tr.B 5-6).  From that location, Bernabei observed two police

officers standing approximately 150 feet away with two individuals, one of whom was wearing a

white shirt and jeans.  Bernabei observed the individuals for one to two minutes.  The weather

was clear, and nothing was obstructing his view.  (Tr.B 7-8).  Bernabei recognized the individual

wearing the white shirt (Burnett) as the person he had observed earlier in the day opening the

door to the Oldsmobile.  (Tr.B 6-8).


_____**Testimony of Investigator Douglas Boccardo:**  Investigator Boccardo testified

that at approximately 1:30 p.m. on August 4, 2004, he responded to the area of Central Park near

the corner of Third Street.  (Tr.B 33-34).  There, Boccardo was instructed by his supervisor,

Sergeant Michael Giaconia, to assist in conducting a show-up identification procedure.  (Tr.B

34).  Specifically, Boccardo was directed to transport a witness, Carl Colosi, to the site of the

4

identification procedure at 191 Pennsylvania Avenue, which was a short distance from where shots had been fired earlier that day.  (Tr.B 34-35).

While en route to Pennsylvania Avenue, Boccardo explained to Colosi that he was going to be shown persons who may or may not have been involved in the incident and there was no pressure on him to make any identification.  Boccardo instructed Colosi that if he did recognize anyone, he should indicate whether that person was involved in the incident or was a bystander.  (Tr.B 35).  Once they arrived at Pennsylvania Avenue, Colosi remained in the unmarked patrol car as Boccardo exited it to speak with Giaconia regarding the identification procedure.  (Tr.B 36).  Because Giaconia was wearing plain clothes, Boccardo asked him to escort the suspects during the procedure.  (Tr.B 37).

At approximately 1:57 p.m., Giaconia walked with an individual wearing a hat to the car in which Colosi was sitting.  Colosi observed the individual and indicated that he recognized the individual, but commented that he did not have a hat on at the time of the shooting.  (Tr.B 37-38).  Boccardo then asked Giaconia to remove Burnett's hat, which he did. (Tr.B 38).  After he did so, Colosi stated, "Yeah, he was one of the ones running up toward my truck from 3rd Street."  (Tr.B 38-40).  Boccardo asked Colosi whether Burnett had a gun, and Colosi responded that he could have.  (Tr.B 40).  Colosi further stated that he recognized Burnett's face and that there had been four or five other people in the group.  Boccardo asked whether some of those other people had been armed, and Colosi replied, "Oh, yeah."  (Tr.B 41). Additionally, Colosi stated that Burnett had walked with another male "to the right side of his van after rounding the corner from 3rd onto Central Park."  Colosi believed that the two men

were walking towards an area behind his van where he had initially observed a confrontation between two people.  (Tr.B 41).

According to Boccardo, the car in which Colosi was seated was approximately twenty feet from where Giaconia and Burnett were standing.  The weather was clear, and nothing obstructed the view from the car to Burnett.  Further, the police radio in the car had been turned down so that Colosi would not overhear any discussions about the procedure.  (Tr.B 43).


**Testimony of Special Agent Sean Martineck:**  Special Agent Martineck testified that on the same day he was working in an undercover capacity with Rochester Police Officer John Brennan.  (Tr.C 5).  Shortly after 1:00 p.m., Martineck received a radio dispatch from Officer Bernabei who reported that shots had been fired in the area of Fifth Street and Central Park and that possible suspects were running from that location.  (Tr.C 6).  Martineck and Brennan responded to the call and arrived in the area of Pennsylvania Avenue and Central Park approximately one minute later.  (Tr.C 8).  Not observing any activity, Brennan radioed Bernabei, stating, "We're in the area and we don't see anything."  (Tr.C 9).  Bernabei then corrected his report and indicated that he was actually on Third Street and Central Park.  (Tr.C 11).  He further reported that suspects had entered a Mazda and provided the license plate number, the first three letters of which were CRU.

At the time he received this message, Martineck was on Pennsylvania Avenue heading toward Sixth Street.  Martineck then looked in his rear-view mirror and observed a Mazda turning from Third Street onto Pennsylvania Avenue.  (Tr.C 12).  Martineck turned his car around and drove towards the Mazda, which was stopped at the intersection of Fourth Street

and Pennsylvania Avenue.  As he pulled up, Martineck observed that the license plate number on

the Mazda started with CRU.  (Tr.C 15).  Martineck, Brennan, and other police officers

conducted a traffic stop of the Mazda and removed two individuals from the car.  The passenger

of the car was later determined to be Burnett.  (Tr.C 16).

Once Burnett had been removed from the car, Martineck secured him with

handcuffs, informed him that he was going to perform a safety pat-down for weapons and asked

him whether he had a problem with that.  Burnett replied that he did not.  (Tr.C 19).  Martineck

then performed a pat-frisk and felt a hard object in Burnett's right, front pocket of his pants.

After removing the object, Martineck discovered that it was a set of keys.  (Tr.C 20).  Martineck

searched the keys to ensure that they did not contain a knife or handcuff key and then placed the

keys back in Burnett's pocket and returned Burnett to the rear seat of the car.  (Tr.C 20-21).

Martineck further testified that he recalled that the keys he observed in Burnett's

pocket were later seized by a law enforcement officer and used to determine whether they fit the

doors to the Oldsmobile.  Martineck believed that one of the keys did in fact unlock the car.

(Tr.D 14-16).

**Testimony of Officer John Kolyer:**  Officer Kolyer testified that on August 4,

2004, at approximately 1:00 p.m., he received a radio broadcast from Bernabei reporting that

shots had been fired in the vicinity of Central Park and Fourth Street and requesting assistance.

(Tr.D 20).  Bernabei also reported that suspects had entered a Mazda with license plate number

CRU 2467.  (Tr.D 19-20).  As Kolyer responded to the call, he approached the intersection of

Fourth Street and Pennsylvania Avenue and observed the Mazda heading in the opposite

direction.  (Tr.D 21).  Kolyer then activated the emergency lights on his police vehicle, exited the

car and, with the assistance of other officers, approached the Mazda with his firearm drawn.

(Tr.D 21).  The two occupants of the vehicle were ordered to get out and were immediately

handcuffed by plain-clothes officers who were on the scene.  (Tr.D 21).  Burnett was later

identified as the passenger of the Mazda and Ronald Parson as the driver.  (Tr.D 21-22).

   Once Burnett was handcuffed, Special Agent Martineck placed him in the rear

seat of Kolyer's police vehicle.  (Tr.D 24).  Kolyer testified that he did not see Burnett being

placed in his patrol car because he had to maintain his position during the traffic stop.  Once that

was completed, Kolyer was informed that Burnett was in his patrol car.  Kolyer further testified

that pursuant to his usual practice, he removed Burnett from the rear seat and conducted his own

security search by patting Burnett's outer clothing and searching his pockets.  (Tr.D 24-25).

Kolyer specifically recalled that Burnett had a set of keys in his right front pocket, one of which

he recognized as a square General Motors ("GM") key.  (Tr.D 24-26).  Kolyer asked Burnett

what the keys were for, and Burnett responded that they operated the trunk of the Mazda.  Kolyer

was surprised by the response because he recognized the square key as an ignition key, rather

than a trunk key, which would be round.  (Tr.D 40-42).  Kolyer then placed the keys back in

Burnett's pocket and returned him to the rear seat of the patrol car.  (Tr.D 25).  Thereafter,

Kolyer questioned Burnett regarding his biographical information.  (Tr.D 26).

   At approximately 2:40 p.m., Kolyer transported Burnett to the Monroe County

Public Safety Building and secured him in an interview room.  According to Kolyer, before

placing an individual in an interview room:

> [I]t's always common procedure and practice to remove certain
> items from pockets and retain them in custody such as lighters,

> keys, pencils, pens because at that point once we put them in the
> room and secure them, they're only handcuffed with one hand, so
> they have one hand free and we have investigators walking in that
> are unarmed and are depending on us to make the scene safe for
> them in the interview room.

(Tr.D 27).  Kolyer specifically recalled removing keys from Burnett's pockets and retaining

possession of them as he completed paperwork related to Burnett.  (Tr.D 27-28).  After

completing the paperwork, Kolyer was advised that an Oldsmobile had been towed from the

scene to the Public Safety Building.  Kolyer then notified Investigator Fiorica that he had seized a

GM key that he believed operated an Oldsmobile, and he provided Burnett's keys to Fiorica.

(Tr.D 28).


**Testimony of Officer John Brennan:**  Officer Brennan testified that on August

4, 2004, he was riding with Special Agent Martineck in Martineck's car when they received a

radio broadcast from Officer Bernabei reporting that shots had been fired in the area of Central

Park and Fifth Street.  Bernabei further stated that several males were running from the scene and

that one of the individuals was entering a vehicle.  (Tr.F 6).  Martineck and Brennan quickly

responded to the area of Central Park and Fifth Street, but did not observe the individuals.

Brennan placed a radio call to Bernabei asking, "Eddie, where are you?"  (Tr.F 6).  Bernabei,

realizing he had provided the wrong address, corrected his location, indicating that he was

actually two blocks away.  (Tr.F 6).  In response, Brennan directed Martineck to turn the car

around and to proceed to Pennsylvania Avenue and Third Street.  As he did so, Bernabei

continued broadcasting and requested a traffic stop of a Mazda, which he reported was traveling

on Third Street toward Pennsylvania Avenue.  (Tr.F 7).

9

Following these broadcasts, Brennan assisted in the traffic stop of the Mazda and participated in the subsequent investigation of Burnett.  Brennan testified that as Burnett was being handcuffed and led away by uniformed officers, he observed a set of keys on the floor of the Mazda.  Brennan did not touch the keys; rather, he left them in the vehicle and responded to 34 Third Street – approximately two blocks from the scene of the traffic stop – to speak with Bernabei.  (Tr.F 11).  Bernabei advised Brennan of the events that transpired and identified a 1987 gray Oldsmobile that was parked in the backyard.  (Tr.F 11, 26, 40).  Recalling the keys he had earlier observed in the Mazda, Brennan requested that the officers at the scene of the traffic stop bring him "keys."[3]  Shortly thereafter, keys were provided to Brennan, which he recognized as the keys he had seen earlier on the floor of the Mazda.  Brennan tested each of the keys to determine whether they unlocked the Oldsmobile.  (Tr.F 8, 11).  Finding that none did, Brennan "sent the keys back" with a uniformed officer.  (Tr.F 12).

Brennan also testified that he assisted in obtaining a search warrant for the Oldsmobile.  (Tr.F 8).  The warrant was signed later that afternoon at 4:29 p.m.  (Tr.F 9).  After obtaining the warrant, Brennan returned to the Public Safety Building, where the Oldsmobile had been placed in a secure area.  (Tr.F 9).  Because Brennan did not have keys to the Oldsmobile at the time the search was initiated, he forced entry into both the trunk and passenger compartment.  (Tr.F 10).  With the assistance of Martineck, Brennan then photographed and conducted a search

---

[3]  Brennan recalled having only requested "keys" generally and testified that he had not specifically requested Oldsmobile keys.  (Tr.F 22).  This Court, however, has been provided with an audio recording of the above-described police radio broadcasts.  Although not entirely clear, a review of that recording appears to reveal that Brennan in fact specifically requested Oldsmobile keys.

of the vehicle.  During the search, two handguns were discovered under the seats[4] and a quantity of crack cocaine was discovered under the driver's seat.  (Tr.F 10).

After the search was completed, Brennan was advised by Officers Giudici and Fiorica that they had obtained a set of keys to an Oldsmobile from Burnett.  Brennan then tested one of the keys and used it to start the Oldsmobile he had just searched.  (Tr.F 14).  Brennan did not recall whether he attempted to open the doors of the vehicle using the keys.  (Tr.F 15).

**Testimony of Investigator David Giudici:**  Investigator Giudici testified that following the traffic stop of Burnett and Parson, he and Investigator Fiorica were directed to respond to the Public Safety Building in order to interview two individuals concerning a shooting.  (Tr.F 47).  Before initiating the interview of Burnett, Giudici was informed that Burnett had been observed by officers entering a vehicle that was in the proximity of the shooting and that he had also been identified during a show-up identification procedure as part of a group of individuals who had been involved in the shooting.  (Tr.F 48).  Before questioning Burnett, Giudici did not advise him of his *Miranda* warnings because, according to Giudici, he had no reason to believe Burnett had committed a crime.  (Tr.F 49-50).  Giudici and Fiorica proceeded to interview Burnett, asking him, among other things, about his relationship to the Oldsmobile at 34 Third Street.  (Tr.F 52).

After the interview, Giudici and Fiorica discussed the incident and the search of the Oldsmobile.  Officer Kolyer overheard the conversation and advised them that he had seized keys from Burnett's person.  Kolyer then provided the keys to Fiorica, and Fiorica and Giudici

---

[4]  Brennan did not specify the seats under which the handguns had been found.

11

brought them to Brennan, who was searching the Oldsmobile.  (Tr.F 57).  According to Giudici, the property had already been recovered from the Oldsmobile before the keys were given to Brennan.  (Tr.F 57).

**Testimony of Investigator John Fiorica**:  Investigator Fiorica also testified that he and his partner, Investigator Giudici, were directed to the Public Safety Building to interview Burnett and Parson.  (Tr.F 58).  Fiorica recalled that after the interview of Burnett, he and Giudici had a conversation about an Oldsmobile that had been taken into custody.  Investigator Kolyer overheard this conversation and informed them that an Oldsmobile key had been seized from Burnett.  (Tr.F 61).  Fiorica then took the keys to Officer Brennan, who had already searched the Oldsmobile.  (Tr.F 62-63).

**Testimony of Zechariah Burnett**:  Burnett testified on the limited issue of the seizure of keys from his person.  According to Burnett, at approximately 1:00 p.m. on August 4, 2004, he was in the passenger seat of a Mazda driven by Ronald Parson, located at the intersection of Pennsylvania Avenue and Fourth Street.  (Tr.E 5, 18).  The car was stopped by police officers, and he and Parson were ordered to get out with their hands in the air.  (Tr.E 6).  Once Burnett stepped out of the car, he walked towards the officers with his hands raised.  A plain-clothes officer, later identified as Sean Martineck, approached him, handcuffed him and asked whether he possessed any drugs or weapons.  (Tr.E 6).  Burnett responded that he did not.  Martineck then conducted a search of Burnett in Officer Kolyer's presence.  (Tr.E 7).  During the search, Burnett testified, Martineck reached into his front right pocket and pulled out a cellular

telephone and two different key rings.  Martineck returned the items to Burnett's pocket and placed him in a police car.  (Tr.E 7-8).  Kolyer sat in the front seat and began questioning him concerning his name and pedigree information.  (Tr.E 8).  After sitting in the car for two to five minutes, Burnett overheard a broadcast on Kolyer's personal police radio instructing him to check the suspects again to determine whether they were carrying any keys.  (Tr.E 9).

Following that transmission, Burnett testified, Kolyer removed him from the car, reached into his front right pocket and pulled out the cellular telephone and the two sets of the keys.  Referring to the second set of keys, Kolyer asked, "What are these?"  "The van keys," Burnett replied.  (Tr.E 9, 16).  Kolyer took possession of the keys, returned Burnett to the patrol car and started walking in the direction of Third Street.  Burnett observed Kolyer provide the keys to another uniformed officer who was approaching from the direction of Third Street.  (Tr.E 10-11).

Burnett waited in the rear seat of the police car for approximately ten minutes. After that time, another officer approached Kolyer and spoke to him.  Kolyer then removed Burnett from the car for a third time and again reached into the pocket where the keys had been. Not finding anything, Kolyer searched Burnett's other pockets.  In the back left pocket, he located five or six loose keys.  Kolyer asked Burnett what each key was for; Burnett responded, indicating that one of the keys operated the trunk of the Mazda.  (Tr.E 11-12).  Kolyer gave the keys to the other officer, who walked in the direction of Third Street.  (Tr.E 12).  Following this search, Burnett was placed back in the car, where he remained for approximately forty-five minutes until the show-up procedure.  (Tr.E 13).

## REPORT AND RECOMMENDATION

Burnett moves to suppress the positive identifications of him by the civilian witness Carl Colosi and by Officer Bernabei.  According to Burnett, both of the identification procedures were unduly suggestive.  Burnett also moves to suppress the keys taken from his person on the grounds that they were unlawfully seized.  (Docket ## 21, 45).  The government disagrees, arguing that neither identification procedure was impermissibly suggestive and that the keys were seized from Burnett's person pursuant to a lawful search.  (Docket ## 26, 44)

## I.   Motion to Suppress Identification

As the Supreme Court has consistently affirmed, a defendant has the right not to be subjected to an identification procedure that creates a "very substantial likelihood of irreparable misidentification."  *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *see also Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).  Moreover, due process requires the suppression of any pretrial identification procedure that is unduly suggestive and not otherwise independently reliable.  *Manson v. Brathwaite*, 432 U.S. at 114 ("reliability is the linchpin in determining the admissibility of identification testimony").

In determining the admissibility of a pretrial identification, the court must undertake a two-step analysis.  First, the court must consider whether the identification procedure was unnecessarily suggestive.  If so, the court then must determine whether the identification nevertheless possessed "sufficient aspects of reliability."  *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.), *cert. denied*, 434 U.S. 872 (1977) (citing *Manson*, 432 U.S. at 109-17).  "Even if

the procedure was unnecessarily (or impermissibly) suggestive, therefore, a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

Where, as here, the challenged identification procedure involves a prompt on-the-scene show-up, the Second Circuit has reasoned that such procedure, properly undertaken, is "'consistent with good police work' and does not offend the principles established in *United States v. Wade*." *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972) (quoting *United States v. Sanchez*, 422 F.2d 1198, 1200 (2d Cir. 1970)) (citations omitted). Indeed, it serves "to insure the immediate release of an innocent suspect and at the same time to enable the police to resume the search for the fleeing culprit while the trail is still fresh." *Id.*; *see United States v. Bautista*, 23 F.3d at 730 (prompt show-up serves to prevent the mistaken arrest of innocent persons); *Mendoza v. McGinnis*, 2004 WL 736894, *6 (S.D.N.Y. 2004) ("show-up identifications that occur in temporal and geographic proximity to the crime have generally been found constitutionally permissible and not unduly suggestive") (collecting cases). Recognizing the importance of these law enforcement objectives, courts have frequently upheld on-the-scene show-ups conducted in temporal and geographic proximity to the alleged criminal conduct, reasoning that such procedures are not *unnecessarily* suggestive. *See*, *e.g.*, *Bautista*, 23 F.3d at 730 (presentation of suspects to a confidential informant immediately after a raid was not unnecessarily suggestive); *Jones v. Strack*, 1999 WL 983871, *11-12 (S.D.N.Y. 1999) (show-up of two armed robbery suspects conducted in park two blocks away was prudent police work and

not unduly suggestive); *Boles v. Senkowski*, 878 F. Supp. 415, 422 (W.D.N.Y. 1995)

(on-the-street identification by victim of armed robbery was not impermissibly suggestive);

*United States v. Gonzalez*, 864 F. Supp 375, 386 (S.D.N.Y. 1994) (on-scene identification by

off-duty police officer who had witnessed defendant's criminal conduct twenty minutes earlier

was not unduly suggestive).

      A. __Identification by Civilian Witness:__ Investigator Boccardo testified that on

August 4, 2004, he was instructed to assist in the identification procedure involving Colosi, the

victim of a reckless endangerment.  (Tr.B 34).  Boccardo first encountered Colosi near the

intersection of Third Street and Central Park and drove him to the site of the show-up.  The

procedure was scheduled to occur nearby, at 191 Pennsylvania Avenue.  (Tr.B 34-36).

      While in the car, Boccardo explained to Colosi that "he was going to see persons

[who] may or may not have been involved in the incident that he observed and there was no

pressure on him to make any identification and if he did recognize anyone, . . . [to] indicate . . . if

they were involved or a bystander that was out at the time."  (Tr.B 35).  Boccardo referred to the

instructions as "standard viewing instructions," indicating that he had used them on over one

hundred prior occasions.  (Tr.B 36).

      After arriving at 191 Pennsylvania Avenue, Colosi remained in the unmarked

patrol car as Boccardo got out to speak with Sergeant Giaconia.  (Tr.B 36).  In an effort to

minimize any undue influence, Boccardo testified that he asked Giaconia to escort the suspects

during the show-up because he was dressed in plain clothes.  (Tr.B 37).  Boccardo then returned

to the car with Colosi and, at approximately 1:57 p.m., Giaconia walked an individual wearing a

hat – later identified as Burnett – to a location roughly twenty feet from the car.  (Tr.B 38, 43).

Viewing Burnett, Colosi indicated that he "looked familiar . . . [but] he didn't have a hat on at the time." (Tr.B 38).  Boccardo called out to Giaconia to remove the hat from Burnett's head, which he did. (Tr.B 38).  Once the hat was removed, Colosi stated, "Yeah, he was one of the ones running up toward my truck from 3rd Street." (Tr.B 38-40).  Boccardo asked whether Burnett had a gun, and Colosi answered that he "could have." (Tr.B 40).  Colosi also added that he recognized Burnett's face and that he had been in a group with four or five other people.  When asked whether some of the other people in the group had been armed, Colosi stated, "Oh, yeah." (Tr.B 41).  Finally, Colosi recounted that Burnett had "walked to the right side of his van after rounding the corner from 3rd onto Central Park." (Tr.B 41).

Considering the totality of the circumstances, the identification procedure involving Colosi was not unduly suggestive.  The law enforcement officers were investigating a very recent incident in which two individuals were shot; in addition, during the shooting, Colosi's van was shot while he was inside.  Burnett had been observed by an undercover officer running from the scene of the shooting, as well as possibly discarding or hiding evidence following the incident.  Given the nature of the investigation, I find that the show-up identification procedure, which occurred less than one hour after the shooting, was reasonable and appropriate.  *See Bautista*, 23 F.3d at 729-30 (upholding show-up procedure during which suspects were shown to confidential informant sitting in a car; "where an officer has 'or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity'") (quoting *United States v. Valez*, 796 F.2d 24, 27 (2d Cir. 1986), *cert. denied*, 429 U.S. 1067 (1987)).  Moreover, to reduce the potential for prejudice, Boccardo turned off his police radio, conducted the show-up in a location

other than where the shooting had occurred, used a plain-clothes officer to escort the suspect and refrained from any conversation with Colosi other than the standard viewing instructions.  On this record, it is my recommendation that Burnett's motion to suppress Colosi's identification of him be denied.

B. **Identification by Officer Bernabei:** Officer Bernabei testified regarding his observations of an individual wearing a white shirt and jeans whom he had seen, along with several others, running from the scene of a shooting.  During the ensuing two to three minutes, he saw that individual enter a van, drive a short distance, exit, open the door of a parked Oldsmobile, lean inside the car, return to the van, drive another short distance, exit the van and enter a black Mazda that was waiting nearby.  (Tr.A 17-20; Tr.B 10-21).  Although Bernabei's initial observation of the individual was from approximately 600 feet away (Tr.B 27), his later observation of him exiting the van and approaching the Oldsmobile was from a distance of approximately fifty feet.  (Tr.B 11).

Approximately one hour later, Bernabei was directed to the intersection of Fourth Street and Pennsylvania Avenue for the purpose of participating in an identification procedure.  (Tr.B 5).  Bernabei then drove in an unmarked car to the intersection of Pennsylvania Avenue and Third Street and exited the vehicle.  (Tr.B 5-6).  From approximately 150 feet away, Bernabei had an unobstructed view of two individuals standing with two police officers.  Bernabei testified that he recognized one of the individuals – who was wearing a white shirt and jeans – as the same person he had seen earlier.  (Tr.B 6-8).  Bernabei further identified Burnett at the hearing as the person he had observed during the show-up identification procedure.  (Tr.B 7).

18

Acknowledging that police officers are trained observers, courts have repeatedly upheld the admissibility of identifications by such officers, finding them sufficiently reliable. *See Manson*, 432 U.S. at 114-15 (finding eyewitness identification made by experienced police officer reliable because he "could be expected to pay scrupulous attention to detail"); *Carter v. Goord*, 2003 WL 23198762, *5 (E.D.N.Y. 2003) (finding denial of *Wade* hearing appropriate because identification was made by trained police officers and thus was more reliable than identification by victim or ordinary citizen); *Alvarez v. Fischer*, 170 F. Supp. 2d 379, 385 (S.D.N.Y. 2001) (recognizing that police officers are not casual observers but have specialized training), citing *Manson*, 432 U.S. at 115.

Here, considering his four years of training and experience as an undercover officer and his detailed observations of Burnett no more than one hour earlier, Bernabei's identification of Burnett was not the product of undue suggestiveness. Furthermore, because the officers were investigating a recent shooting in broad daylight on a city street, from which suspects were observed fleeing the scene, Bernabei's participation in a show-up identification was an appropriate investigative technique to use under the circumstances. It is therefore my recommendation that Burnett's motion to suppress the identification by Bernabei be denied.

## II. Motion to Suppress Keys

Burnett also moves to suppress evidence seized from his person during his detention following the identification procedures. Specifically, Burnett challenges the seizure of the Oldsmobile keys. (Docket # 45). In order to evaluate Burnett's claim, this Court must

consider the lawfulness of the traffic stop of the Mazda in which Burnett was traveling, the subsequent investigative detention of Burnett and, finally, the search of his person.

A. **Reasonableness of the Traffic Stop:** As the Second Circuit has observed, an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment. *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994). A traffic stop must be justified by probable cause or "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *Id.* (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994)); *see Terry v. Ohio*, 392 U.S. 1, 30 (1968) (police officer may lawfully conduct brief stop and frisk for weapons, without probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Illinois v. Wardlow*, 528 U.S. 119, 123-26 (2000) (when officer has a reasonable, articulable suspicion that criminal activity is afoot involving a vehicle, a brief investigative detention is warranted); *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest). Evidence obtained as the result of an unjustified traffic stop "is subject to the fruit of the poisonous tree doctrine" and may be suppressed. *United States v. Scopo*, 19 F.3d at 781 (citing *United States v. Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Officer Bernabei testified that he heard gun shots fired near the intersection of Third Street and Central Park. (Tr.A 8, 12; Tr.B 4). After hearing the shots, Bernabei observed four or five individuals running from the corner. (Tr.A 10-12; Tr.B 26-27). As he moved closer to the scene, some of the running individuals fled through the yards of the houses lining the

street.  (Tr.A 16).  One of the individuals, later identified as Burnett, ran to a nearby van, got in it and drove to a driveway forty or fifty feet from Bernabei's location.  (Tr.A 17-18; Tr.B 10-12). According to Bernabei, Burnett then exited the van and approached an Oldsmobile that was parked in the backyard.  Apparently using a key to open the door, Burnett reached down into the Oldsmobile, then stood up and ran back to the van.  (Tr.A 19).  Burnett drove the van a short distance to the intersection of Third Street and Pennsylvania Avenue, where he parked. Moments later, a black Mazda that had been parked nearby pulled up to the van, and Burnett got inside the Mazda.  (Tr.A 19-20; Tr.B 19-21).  Based on these events, Barnabei requested a traffic stop of the black Mazda.

The testimony offered by Special Agent Martineck and Officers Brennan and Kolyer was consistent with Bernabei's.  Those witnesses recalled receiving a radio broadcast from Bernabei reporting that shots had been fired and that a suspect had entered a black Mazda that was traveling on Third Street.  (Tr.C 6-11; Tr.D 19-20; Tr.F 6-7).  Pursuant to Bernabei's request, the officers assisted in a traffic stop of the Mazda.  (Tr.C 16; Tr.D 21; Tr.F 11).  During the stop, the driver and passenger were removed from the car, patted-down and detained pending further investigation concerning their possible involvement in the shooting.  (Tr.C 19; Tr.D 21).

On the record before me, I find that the officers were reasonable in concluding that the occupants of the Mazda, particularly Burnett, were likely to have been involved in the shooting.  *See Terry v. Ohio*, 392 U.S. at 30; *Illinois v. Wardlow*, 528 U.S. at 123-26. Accordingly, reasonable suspicion existed to believe that criminal activity was afoot, thus justifying the traffic stop of the Mazda.

B. **Investigative Detention:**  The lawfulness of an investigative stop involves a two-part inquiry.  First, as discussed above, the police officer must have "reasonable suspicion" that the suspect has committed or is about to commit a crime.  *Terry*, 392 U.S. at 20-23.  Second, the court must consider the length of the detention, which "must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see United States v. Sharpe*, 470 U.S. 675 (1985).  In other words, an investigative stop may not continue indefinitely; at some point, such a stop ceases to be investigative and becomes a *de facto* arrest.  *United States v. Sharpe*, 470 U.S. at 685.

The Supreme Court has declined, however, to delineate a "bright line" time limit beyond which an investigative stop will be considered unreasonable.  *Id.*  Rather, "common sense and ordinary human experience" must inform that determination, illuminated by a recognition that "[i]f the purpose underlying a *Terry* stop – investigating possible criminal activity – is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* []."  *Id.* at 685-86 (quoting *Michigan v. Summers*, 452 U.S. 692, 700, n.12. (1981)).

Among the factors the court should consider in evaluating the reasonableness of the length of an investigative stop are "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, [and whether] it was necessary to detain the defendant [during that period]."  *Id.* at 686 (citing *Michigan v. Summers*, 452 U.S. at 701, n. 14).  Particular attention should be paid to whether the situation confronted by the police was quickly-evolving; if so, the court should refrain from "unrealistic second-guessing."  *Id.*  Where the nature of the crime being investigated is serious and the likelihood of

the detainee's involvement is apparent, a longer period of detention may be warranted.  *United States v. Oates*, 560 F.2d 45, 59 (2d Cir. 1977) ("when the police officer knows or suspects that an offense with serious societal consequences is being committed and there is some reasonable possibility that the person he detains is involved, a more substantial detention is justified").

In this case, as described above, Officer Bernabei's observations led to the lawful traffic stop of the Mazda in which Burnett was traveling.  Once the stop was performed, Burnett was removed from the passenger seat of the Mazda, handcuffed and patted-down to ensure officer safety.  (Tr.C 19).  Burnett was then placed in the rear seat of Officer Kolyer's patrol car. (Tr.D 24).

The testimony is clear that approximately one hour elapsed between the traffic stop and the show-up identification procedure, during which time Burnett was detained.  (Tr.B 4, 37-38; Tr.E 11, 13).  Under the circumstances, and applying the above-cited authority, I find that this period was not unreasonable.  The officers were engaged in the immediate investigation of a shooting from which Burnett was observed fleeing the scene and possibly attempting to discard or conceal a weapon or other incriminating evidence in a parked Oldsmobile.  Following the traffic stop of the car in which Burnett was traveling, the officers continued their investigation of the Oldsmobile and promptly arranged for the two identification procedures.  These actions, this Court finds, were appropriate responses to potentially dangerous events that were still unfolding.  So too was the officers' decision to detain Burnett for the approximate one-hour period before his identification by Colosi as a member of the group of four or five armed individuals who had been involved in the shooting.

Following the show-up procedure, Burnett was transported to the Public Safety Building where he was detained.  During that period of detention until his formal arrest, which appears to have lasted approximately four hours[5], a search warrant for the Oldsmobile was drafted, presented to a state court judge, issued and executed.  (Tr.F 9).  As previously noted, that search uncovered two handguns and a quantity of cocaine.  (Tr.F 10).

Burnett did not freely and voluntarily accompany the officers to the Public Safety Building, and the government does not argue to the contrary.  Rather, he was handcuffed, both during the transportation there and while he was in the interview room (Tr.c 19; Tr.D 27); at no point was he free to leave the building.  Considering these facts, the officers' decision to question him likely amounted to custodial interrogation requiring *Miranda* warnings.  The government wisely has determined not to offer any statements made by Burnett during that questioning in its direct case at trial.

That issue is, of course, a different question from the lawfulness of Burnett's detention at the Public Safety Building.  *See United States v. Newton*, 369 F.3d 659, 673 (2d Cir.) (Second Circuit "has specifically rejected Fourth Amendment reasonableness as the standard for resolving *Miranda* custody challenges"), *cert. denied*, 125 S. Ct. 371 (2004).  I find, on the record before me, that the officers were justified in detaining Burnett, rather than releasing him following the two positive identifications and pending the results of the search of the

---

[5]  The government did not elicit testimony indicating the precise time at which Burnett was formally arrested.  It is known, however, that the initial traffic stop occurred at approximately 1:00 p.m. (Tr.A 8), and the show-up identification procedure occurred approximately one hour later.  (Tr.B 37).  Burnett was then transported to the Public Safety Building at approximately 2:40 p.m.  (Tr.D 27).  The search warrant for the Oldsmobile was subsequently obtained at 4:29 p.m., with the search apparently occurring shortly thereafter.  (Tr.F 9).  Although it is unclear how long the search lasted, Burnett was apparently arrested following the search of the Oldsmobile and the discovery of the firearms and narcotics.

Oldsmobile.  At the time he was brought to the building, he had been identified as a participant in a small group of armed individuals who had been involved in a shooting that had occurred earlier in the day on a city street.  He was further identified as one of the individuals seen fleeing the scene, entering and exiting several different cars and possibly discarding evidence into a parked Oldsmobile.  With this information, the officers were confronted with the choice to release him – a decision that could have posed a dangerous risk to others and the community, to detain him for further investigation or to arrest him.[6]  The decision to hold him until the results of the search were known properly balances the countervailing interests.  Given the speed with which the search authorization was requested, obtained and utilized, his detention during that four-hour period of time was reasonable and justified.  *See*, *e.g.*, *United States v. Montoya de Hernandez*, 473 U.S. 531, 542-44 (1985) (finding that sixteen-hour investigative detention was not unreasonable where defendant suspected of swallowing balloons containing cocaine was held in airport security room); *Diesel v. Town of Lewisboro*, 232 F.3d 92, 106-07 (2d Cir. 2000) (Fourth Amendment not violated by defendant's six-hour investigative detention following the discovery of him, a New York State Trooper whose responsibilities involved driving the lieutenant governor, passed out in a car with the engine running and a bottle of wine in the back seat and blood on his nose and face); *see also Adams v. Williams*, 407 U.S. 143, 145 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary

---

[6]  Should the district court conclude that Burnett's detention at the Public Safety Building amounted to a *de facto* arrest, either by virtue of its length or location or both, I find in the alternative that probable cause existed to arrest him at the time he was transported to the building.  By that time, he had been identified as a member of a small group of armed individuals involved in a shooting, from which he was seen fleeing and thereafter possibly discarding or concealing evidence.

for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape").

      **C.  Seizure of the Keys:**  Although it appears clear that Burnett possessed keys at the time the Mazda was stopped and that certain of those keys were seized from him at some point following the stop, when those searches and seizures occurred and which keys were taken when is far from clear.  As explained below, however, resolution of those issues is unnecessary to a determination of Burnett's suppression motion.  Accordingly, I decline to resolve the factual disputes surrounding when the GM ignition key was seized from Burnett.

      Under the government's version of events, keys were found on Burnett's person and returned to him on two separate occasions – both during the course of security pat-downs: the first was conducted by Special Agent Martineck when Burnett was removed from the Mazda (Tr.C 20); the second was conducted by Officer Kolyer when Burnett was placed in his car (Tr.D 24-25).[7]  These keys were removed from Burnett's possession only upon arrival at the Public Safety Building, and that removal was purportedly for officer safety in accordance with established written policy of the Rochester Police Department.

      Following the traffic stop, Burnett was transported to the Public Safety Building where he was placed in an interview room.  Before he was put into the interview room, Kolyer testified, the keys were removed from Burnett's pocket.  (Tr.D 27-28).  Specifically, Kolyer testified that whenever he places someone in an interview room, it is "common procedure and practice to remove certain items from pockets and retain them in custody such as lighters, keys,

---

[7]  According to the government, the keys that were brought to Officer Brennan at 34 Third Street and tried without success on the Oldsmobile were keys that were observed on the floor of the Mazda during the traffic stop. (Tr.F 8, 11).

pencils, pens . . . ."  (Tr.D 27).  Indeed, Rochester Police Department General Order 410(G)

specifies that before placing a person who is under temporary investigative detention into an

interview room "personal property of the suspect that may pose a threat to the [officer] or

detainee (i.e., belts, shoelaces, etc.) will be removed and processed . . . ."  *See Saillant v. City of*

*Greenwood*, 2003 WL 24032987, *6 (S.D. Ind. 2003) ("The court readily grants that, depending

on their size and shape, keys may be wielded as a weapon, just like any other sharp, hard

object").

       The record is unclear whether the keys were taken pursuant to a pat-frisk or were

obtained following a more expansive search.[8]  While a frisk to ensure officer safety would appear

justified by the officers' concern about a detainee's access to personal effects while only

handcuffed, as Burnett was, by one wrist to the interview table, *see Terry*, 392 U.S. at 27 (during

lawful investigatory detention, officer may conduct pat-frisk for weapons); *United States v.*

*Colon*, 250 F.3d 130, 134 (2d Cir. 2001) (pat-frisk of suspect under investigative detention

justified if reason to suspect he is armed and dangerous); *see also United States v. Casado*, 303

F.3d 440, 448-49 (2d Cir. 2002) (search of defendant's pockets not permissible without first

conducting a pat-frisk and finding object believed to be a weapon), a full search of his person

may have exceeded such justification.  If the keys were in fact taken as a result of a search more

expansive than a pat-frisk, however, their seizure should nonetheless be upheld under the

doctrine of inevitable discovery.

       Under the doctrine of inevitable discovery, the court must determine "that viewing

affairs as they existed at the instant before the unlawful search, what would have happened had

---

[8]  The written policy appears to authorize a complete search of his person.  (Docket # 50, Ex. A).

the unlawful search never occurred." *United States v. Eng,* 971 F.2d 854, 861 (2d Cir. 1992). Here, regardless of the manner in which they were seized, the keys nevertheless would have been seized upon his arrest following the search of the Oldsmobile. *See United States v. Robinson*, 414 U.S. 218, 234 (1973) (upon arrest, suspect may be subjected to warrantless search; neither probable cause or reasonable suspicion that a weapon will be found is required); *United States v. Rahman*, 189 F.3d 88, 120 (2d Cir. 1999) (finding that evidence seized from defendant's pockets would inevitably have been obtained pursuant to search incident to arrest), *cert. denied*, 528 U.S. 1094 (2000).  Moreover, because the keys were not determined to operate the Oldsmobile until after the authorized search of the vehicle had taken place, any seizure of the keys that may have occurred earlier did not result in the impermissible seizure of any evidence.

Burnett disputes the government's factual version of events, contending that his testimony and the recording of the police radio broadcasts demonstrate that keys were unlawfully taken from him during the traffic stop.[9]  Even if that were true, which is a determination I need not make, I find that the keys inevitably would have been discovered for the reasons stated above.  Accordingly, the keys seized from Burnett's person do not warrant suppression because they either were properly taken pursuant to a lawful pat-frisk or inevitably would have been discovered pursuant to a search incident to arrest.  It is therefore the recommendation of this Court that Burnett's motion to suppress be denied.

---

[9]  While I agree with Burnett that a review of the tape appears to confirm that Brennan requested "Oldsmobile keys," it does not necessarily follow that the keys subsequently brought to him were seized from Burnett's person.  Indeed, Brennan testified that he recognized the keys presented to him as the same keys he had observed earlier on the floor of the Mazda and that they did not unlock the Oldsmobile.  (Tr.F 11-12).  Thus, regardless of the location from which the keys were seized, they did not lead to the discovery of any evidence.

## <u>CONCLUSION</u>

For the foregoing reasons, it is my recommendation that defendant's motions to suppress the identification of him following a traffic stop **(Docket # 21)** be **DENIED**.  It is my further recommendation that defendant's motion to suppress physical evidence **(Docket # 21)** be **DENIED**.

_s/Marian W. Payson_

MARIAN W. PAYSON  
United States Magistrate Judge

Dated: Rochester, New York  
      September   22  , 2005.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[10]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

    s/Marian W. Payson
            MARIAN W. PAYSON
          United States Magistrate Judge

Dated: Rochester, New York
          September  22 , 2005.

---

[10]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).